# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

LORI CHAVEZ-DEREMER,
SECRETARY OF LABOR,
UNITED STATES DEPARTMENT OF LABOR,

      **Plaintiffs,**

v.                                                                    **CIVIL ACTION NO. 2:21-cv-531**

PLAZA AZTECA YORKTOWN, INC.,
PLAZA AZTECA HAMPTON, INC., and
RUBEN LEON,

      **Defendants.**

## *MEMORANDUM OPINION AND ORDER*

Before the Court is Lori Chavez-Deremer[1], Secretary of the United States Department of Labor's ("the Secretary") Motion and Memorandum in Support to Adjudge Plaza Azteca Yorktown ("Plaza Yorktown"), Plaza Azteca Hampton ("Plaza Hampton"), and Ruben Leon ("Mr.Leon") (collectively, "Defendants") in contempt of the Court's September 26, 2023, Consent Judgment and Order. ECF No. 83 ("Mot.") ("Mem. Supp."). Defendants oppose the Motion. ECF No. 92. The Secretary replied. ECF No. 96. On January 23 and 24, 2025, the Court held a hearing on this matter. ECF Nos. 110, 111. The parties requested to submit supplemental briefs in lieu of closing arguments. The Court ordered the parties to submit simultaneous supplemental briefs no later than thirty days after receipt of the hearing transcript. ECF No. 112. The Secretary and Defendants submitted post-hearing briefs.[2] ECF Nos. 115, 116 ("Sec. Brief") ("Def. Brief"). The

---

[1] Since the filing of the case, Lori Chavez-Deremer was appointed the Secretary of Labor. She is therefore automatically substituted as a party pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] Defendants violated the Court's Order to file simultaneous briefs without rebuttal by commenting on the Secretary's brief. ECF No. 112; Hearing Transcript, Vol. 2, 284:11–12; Def. Brief at 12 n.7. Defendants' comments will not be sanctioned in the Court's adjudication of this matter.

Court has read the memoranda of the parties, and this matter is ripe for judicial determination. For the reasons stated herein, the Secretary's Motion is **GRANTED**.

## I.    FACTUAL AND PROCEDURAL HISTORY

Ruben Leon has an ownership interest in each of the Plaza Azteca locations involved in this case. Responses to Requests for Admission, ECF No. 71-4 at 6 ("Resp. to RFA"). On September 21, 2021, the Secretary filed a complaint against 45 Plaza Azteca locations and their operators. ECF No. 1 ("Compl."). The Complaint alleged violations of Sections 6, 7, 11(c), 15(a)(2), and 15(a)(5) of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (the "FLSA" or the "Act"). *Id.*

On September 26, 2023, the Court issued an Amended Consent Judgment and Order in which Defendants admitted to violations of the Act. ECF No. 81 ("Consent Judgment"). The Consent Judgment enjoined and restrained Defendants from violating the FLSA. *Id.* The Consent Judgment required Defendants to:

(1) pay minimum wages in accordance with Sections 6 and 15(a)(2) of the FLSA;

(2) pay overtime in accordance with Sections 7 and 15(a)(2) of the FLSA;

(3) keep adequate records of wages, hours, and other employment practices in accordance with Section 11(c) of the Act;

(4) cooperate with the Department of Labor in any investigation conducted pursuant to Section 11(a) of the Act; and prohibited Defendants from

(5) employing children in oppressive child labor conditions as defined by Section 12 of the FLSA.

*Id.* ¶ 1(a)–(e).

According to the Secretary, in February 2024, the Wage and Hour Department ("WHD") began an investigation to determine whether Plaza Yorktown was complying with the FLSA and Consent Judgment. Mem. Supp. at 3. A WHD investigator conducted employee interviews during

his first visit to Plaza Yorktown. *Id.* The next day, Plaza Azteca management turned the investigator away after speaking with their attorney. Hearing Transcript, Volume 1, 91:3–6, 91:10–13, ECF No. 113 ("Hr. Tr.").

WHD conducted employee interviews between February and April 2024. Mem. Supp. at 4. These interviews revealed several potential violations of the Act. Allegedly, employees informed WHD that one minor was working five days a week, close to 40 hours or more, worked during the school day, and stayed on the job until 9:00 or 10:00 PM. *Id.* WHD then interviewed this minor, who claimed he was 17 years old. *Id.* at 5. He told the investigator that he worked over 12 hours a day and that he operated the deep fryer. *Id.* The Department of Health and Human Services informed WHD that the minor was 14 years old. *Id.*

In September 2024, WHD obtained information of possible child labor violations at Plaza Hampton. *Id.* WHD visited Plaza Hampton on September 9, 2024, but they were turned away after Defendants' counsel told WHD they must provide advance notice and schedule an appointment. *Id.* at 6. WHD applied for a search warrant and executed the search warrant on September 14, 2024. *Id.* The warrant execution team included nine investigators. *Id.* WHD investigators interviewed employees, inspected the kitchen, and reviewed schedules. *Id.* They inquired about the ages of the employees who worked there. *Id.* at 7.

While executing the warrant, investigators observed a minor female employee. *Id.* The minor presented her identification: she was 15 years old. *Id.* The General Manager stated that this minor was a new employee whose credentials were not active in their Point of Sales system yet. *Id.* The General Manager provided WHD a copy of the schedule for the week of September 9. *Id.* The minor was scheduled to work from 11:00 AM to 9:00 PM Tuesday through Thursday. *Id.* Therefore, she could not attend school. *Id.* at 8.

WHD investigators also asked the General Manager about a third employee that was not present. *Id.* When WHD asked his age, the General Manager went to the office, returned, and indicated that he was 20 years old. *Id.* The General Manager stated he obtained this information from counsel.[3] *Id.* WHD met with this employee and determined that he was also 15 years old. *Id.* This minor told investigators that he does not attend school. *Id.* He stated that he worked over 40 hours a week and often worked past 9:00 PM. *Id.* 8–9. The minor stated his work included using the fryer basket. *Id.* at 9.

The Secretary alleges violations of Sections 6 and 7 of the FLSA. Through employee interviews, WHD learned of potential minimum wage and overtime violations at Plaza Hampton and Plaza Yorktown. *Id.* at 10. Specifically, payroll records indicated that employees had a remaining net pay balance after Plaza Yorktown deducted the tip credit from employees' paychecks. *Id.* But during interviews, servers reported never receiving these payments. *Id.* Several Plaza Yorktown servers told WHD that they performed pre- and post-shift work without pay. *Id.* at 10–11. Plaza Hampton employees reported staying at work after they clocked out to clean the restaurant. *Id.* at 12. Both Plaza locations employ First Cooks who are salaried and do not receive overtime pay. *Id.*

## II.    LEGAL STANDARD

Civil contempt is appropriate where a party has violated an order of a court which "'set[s] forth in specific detail an unequivocal command' which a party has violated." *In re General Motors*, 61 F.3d 256, 258 (4th Cir. 1995) (quoting *Ferrell v. Pierce*, 785 F.2d 1372, 1378 (7th Cir. 1986)). The violation must be of an order that is "clear and unambiguous." *Id.* (quoting *Project*

---

[3] Counsel denies this. The General Manager later provided a declaration stating that the employee provided his age via documents accompanying his Form I-9. Declaration of Diego Molina-Tepa, ECF No. 92-4 at ¶ 6 ("Molina-Tepa Decl.").

*B.A.S.I.C. v. Kemp,* 947 F.2d 11, 16 (1st Cir.1991)). To establish civil contempt, Plaintiff must show each of the following elements by clear and convincing evidence:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge;
>
> (2) that the decree was in the movant's "favor";
>
> (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive) of such violations; and
>
> (4) that [the] movant suffered harm as a result.

*Ashcraft v. Conoco, Inc.,* 218 F.3d 288, 301 (4th Cir.2000) (quoting *Colonial Williamsburg Found. v. The Kittinger Co.,* 792 F .Supp. 1397, 1405–06 (E.D.Va.1992), *aff'd,* 38 F.3d 133, 136 (4th Cir.1994)).

A good faith attempt to comply, even if such attempt proves ineffective, is a defense to a civil contempt order. *Consolidation Coal Co. v. Local 1702, United Mineworkers of Am.,* 683 F.2d 827, 832 (4th Cir. 1982) (citing *Consolidation Coal Co. v. Int'l Union, United Mine Workers of Am., et al.,* 537 F.2d 1226 (4th Cir. 1976)). Other defenses include substantial compliance or the inability to comply. *Id.* (citing *Washington Metro. Area Transit Auth. v. Amalgamated Transit Union,* 531 F.2d 617 (D.C. Cir. 1976)).

If contempt is found, the trial court has broad discretion to fashion a remedy. *In re General Motors,* 61 F.3d at 259. A coercive contempt sanction may involve imprisonment or a fine. *See Bagwell,* 512 U.S. at 829. With respect to fines, the power to fine is based on power to fashion injunctive relief; without the authority to levy fines, a court would have power to grant a remedy but no effective means of enforcement. *Consolidation Coal Co. v. Local 1702, United Mineworkers of Am.,* 683 F.2d 827, 829–30 (4th Cir. 1982). A contempt fine is considered civil when the fine is remedial (i.e., either paid to the complainant or, when payable to the court,

avoidable by the contemnor by simply performing the affirmative act required by the court's order). *Buffington*, 913 F.2d at 133. *See also Bagwell*, 512 U.S. at 829 (if the fine is not intended to compensate, it is civil only if the contemnor can purge the fine, i.e., reduce or avoid the fine through compliance). In other words, a fine that is payable to the court but not conditioned on compliance with a court order is punitive and therefore, not civil. *Buffington*, 913 F.2d at 134. As to the nature of the fine, a court may impose "a per diem fine . . . for each day a contemnor fails to comply with an affirmative order . . . . [S]uch fines exert a constant coercive pressure, and once the . . . command is obeyed, the future, indefinite, daily fines are purged." *Bagwell*, 512 U.S. 821, 829.

Courts may also order the contemnor to reimburse the complainant for reasonable attorney's fees. *In re General Motors*, 61 F.3d at 259 (citing *United States v. Trudell*, 563 F.2d 889, 891 (8th Cir.1977)). Although willfulness is not an element of civil contempt, *Id.* at 258 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)), district courts in this Circuit have held that before awarding attorney's fees, a finding of "willful disobedience"—whereby the contemnor's conduct rises to the level of obstinance or recalcitrance—may be required. *Omega World Travel, Inc. v. Omega Travel, Inc.*, 710 F. Supp. 169, 172–73 (E.D.Va.1989), *aff'd*, 905 F.2d 1530 (4th Cir.1990) (unpublished), (citing *Wright v. Jackson*, 522 F.2d 955, 957–58 (4th Cir. 1975)). Mere negligence or carelessness is insufficient to support an award of attorney's fees. *Id.*

### III. DISCUSSION

The first two elements of the contempt analysis are satisfied. These issues are uncontested. First, the Court issued a valid decree of which Defendant had actual or constructive knowledge. In the Consent Judgment, "Defendants admit[ted] that they violated" the Act, and counsel for all Defendants signed. Consent Judgment at 1, 11. Second, the Consent Judgment was in the

6

Secretary's favor. Therefore, the Court will only discuss the parties' arguments on the remaining two elements. Defendants argue they are not in contempt because they did not know of the alleged violations and made reasonable efforts to comply with the Consent Judgment. Def. Brief. at 10. For the reasons discussed below, the Secretary has established by clear and convincing evidence that Defendants are in contempt of the Court's Consent Judgment.

## A. Contempt

The purpose of judicial sanctions in civil contempt proceedings are twofold: "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 536 (4th Cir. 2022) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947)).

The Secretary argues that both the third and fourth elements of contempt are met here. Sec. Brief at 2. The Secretary argues that Defendants failed to comply with child labor regulations in violation of the Consent Judgment. *Id.* She further argues that Defendants failed to comply with the minimum wage provisions of the FLSA. *Id.* at 6. The Secretary contends that Defendants did not comply with the overtime and recordkeeping provisions of the Act. *Id.* at 10, 13. The Secretary argues that Defendants interfered with WHD's investigation. *Id.* at 15. Finally, the Secretary argues that Defendants' conduct caused the Secretary significant harm. *Id.* at 16.

Defendants argue that the Secretary has proven neither the third nor the fourth element of contempt. As for the third element, Defendants argue their conduct is not contemptuous because that the Secretary failed to establish knowing violations. Def. Brief at 10. Defendants argue that the Secretary failed to rebut Defendants' evidence that First Cook is an exempt employee under the FLSA. *Id.* Defendants further argue that the Secretary did not establish a knowing child labor violation. *Id.* at 11. Defendants contend that the Secretary failed to prove off-the-clock work. *Id.*

at 14. Defendants aver that the Secretary did not establish nonpayment. *Id.* at 15. Defendants argue that the Secretary has not met the fourth element because she failed to prove actual harm. *Id.* at 16.

### i.    Alleged Child Labor Violations

The parties do not dispute that there were violations of the Act and the Consent Judgment. *See* Sec. Brief at 3, Def. Brief at 12–14. Defendants do not dispute that the minors' work conflicted with their schooling in violation of 29 C.F.R. § 570.35(a). And they do not dispute that Minor 1 used a manual deep fryer in violation of 29 C.F.R. § 570.34(c). Rather, the parties disagree as to whether Defendants' conduct rises to the level of contempt.

The Secretary argues that Defendants violated the Consent Judgment by employing 14- and 15-year-olds in a manner prohibited by the Act. Sec. Brief at 2. Specifically, the Secretary points to three minors who were employed at Plaza locations. Sec. Brief at 3–6. The Secretary argues that on the violations related to these three minors Defendants knew or should have known of the minors' ages and that their conduct constitutes contempt. *See id.*

Defendants argue that the Secretary has not proven that Defendants knowingly violated the FLSA's child labor provisions. Def. Brief at 11. Defendants further argue that the Secretary must prove that they knew or should have known that a minor was unlawfully employed. *Id.* at 12. Defendants contend that because they did not have actual knowledge or the opportunity to acquire said knowledge through reasonable diligence, there is no violation. *Id.*

As outlined above, a good faith attempt to comply, even if the attempt is ineffective, is a defense to a civil contempt order. *Consolidation Coal Co. v. Local 1702, United Mineworkers of Am.*, 683 F.2d 827, 832 (4th Cir. 1982) (citing *Consolidation Coal Co. v. Int'l Union, United Mine Workers of Am., et al.*, 537 F.2d 1226 (4th Cir. 1976)). However, an employer who has the

opportunity through reasonable diligence to acquire knowledge of a minor's unlawful employment can be held in contempt. *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 512 (5th Cir. 1969).

### a.  Employment of Minor 1

Minor 1 ("B.C.") stated he was hired at Plaza Yorktown around August of 2023. Hr. Tr., Vol. 1, 146:7–8. But the WHD investigator reviewed his pay records and found that Defendants "had him on the time records dating back to early 2021." *Id.* 94:16–18. B.C. provided the investigator with an ID card on the investigator's second visit with B.C. *Id.* 144:1–6. That ID card, upon which Defendants argue they relied, listed B.C.'s birth date as July 20th, 2003. *Id.* 145:15–17. The WHD investigator later learned that B.C.'s real date of birth is July 20, 2009. *Id.* 104:23.

The Court concludes that Defendants did not exercise reasonable diligence to acquire knowledge about B.C.'s unlawful employment. Defendants have an affirmative duty to ascertain the FLSA's requirements and meet them. *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004). Deciding that Defendants can be absolved of wrongdoing simply because they did not know B.C.'s age would send the wrong message: it would incentivize employers to be willfully ignorant of their unlawful employment minors. In other words, if an employer never accepts the responsibility of acquiring knowledge, they can ostensibly do anything without consequences, so long as they never choose to know about their conduct. This practice would eventually become a feature of employment, leading to more exploitative workplaces. The Court cannot allow Defendants to "simply remain blissfully ignorant of FLSA requirements." *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984).

Defendants argue that they reasonably relied on the false documents B.C. gave them.[4] To support this assertion, Defendants cite *Su v. Mar-Jac Poultry of Alabama, LLC*, No. 6:24-CV-

---

[4] The Court reviewed the identification B.C. provided. B.C's appearance in the still photo alone should have raised red flags. The fact that Defendants did not inquire about B.C.'s age baffles the Court.

00569-LSC, 2024 WL 3278954 (N.D. Ala. July 2, 2024). There, all the minor employees submitted false documents which stated they were older than eighteen. *Id.* at *3. The employer ran the documents through E-Verify, a system operated by the United States of America, which confirmed the validity of the documentation. *Id.* The court in *Mar-Jac* concluded that the employer was reasonably diligent in acquiring knowledge of the unlawful employment of minors. *Id.*

The same cannot be said of Defendants here. There is nothing in the record to suggest that Defendants did anything more than take B.C.'s false documents at face value. Reasonable diligence, in the form of using E-Verify for example, would have revealed B.C.'s age (or at the very least revealed that the documents were not real). But Defendants did not need to use E-Verify to determine they were unlawfully employing B.C. Indeed, several employees that the WHD investigator interviewed "knew [B.C.] by name, [and] knew him to be 14[] or 15 year[s] old[], based on their conversations with him." Hr. Tr. Vol. 1, 97:21–23.

Defendants also argue that because they relied on B.C.'s false identification, and hired him before the Consent Judgment, there was no knowing violation because the order was not yet in effect. Def. Brief at 12. This argument fails because the Act is focused on employment rather than hiring. B.C.'s unlawful employment was ongoing: Defendants cannot skirt a violation by claiming they hired B.C. before the Consent Judgment.

### b. Employment of Minor 2

Defendants fair no better with Minor 2 ("D.A."). According to a payroll document admitted as Exhibit 5, D.A. was 15 years old when she was hired at Plaza Hampton on September 10, 2024. Hr. Tr., Vol. 1, 115:3–4. Defendants do not dispute this. *See* Def. Brief at 13. Defendants' auditor testified that D.A. was "already on payroll for a week," and that "she worked two 12-hour shifts."

Hr. Tr., Vol. 2, 235:23–24. The auditor notified Defendants of the issue and worked with management to correct it. *Id.* 236:13–15.

Defendants essentially raise a substantial compliance defense. *See* Def. Brief at 13 (citing *United States v. Darwin Const. Co.*, 679 F. Supp. 531, 536 (D. Md. 1988), *aff'd as modified*, 873 F.2d 750 (4th Cir. 1989) (analyzing the defendant's substantial compliance defense)). They argue that D.A. only worked three shifts and that this does not justify a contempt finding. *Id.* In *Darwin Const. Co.*, the court held that "[i]f a violating party has taken 'all reasonable steps' to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt." 679 F. Supp. at 536.

Defendants' argument fails on both fronts. First, the record is clear that Defendants did not take all reasonable steps to comply with the Court's Order. Defendants had payroll documents that show D.A.'s date of birth and confirm that she was 15 when she was hired. Hr. Tr., Vol. 1, 114:24–115:4. Defendants knew that D.A. was 15 years old, yet D.A. "worked two 12-hour shifts." Hr. Tr., Vol. 2, 235:24. And second, if this were an isolated incident, the Court might be inclined to conclude that this was a "technical or inadvertent" violation that does not justify contempt. But this is not "a single minor working three improper shifts, without evidence of ongoing noncompliance" as Defendants suggest. Def. Brief at 13. This is a pattern.

### c. Employment of Minor 3

Finally, Minor 3 ("J.R.") was 15 years old when the WHD investigator interviewed him at Plaza Hampton. Hr. Tr., Vol. 1, 133:24–134:5. According to WHD's investigation, J.R. "regularly worked more than 40 hours a week; [] always worked after 9 p.m.; [and] used the deep fryer." *Id.* 133:12–13. Defendants do not dispute this either. *See* Def. Brief at 13–14. Rather, Defendants argue that "Plaza Hampton properly relied on valid identification" confirming he was over 18. *Id.*

11

at 13. Defendants further argue that the Secretary did not present evidence suggesting the documents were false. *Id.*

Despite the Court's concerns about Defendants' employment of J.R., the Court concludes that the Secretary has not met her burden of demonstrating by clear and convincing evidence a knowing violation of the Consent Judgment. Defendants aver that they relied on valid identification (J.R.'s Form I-9), that stated he was over 18, when he was hired. Def. Brief at 13. The WHD investigator testified that the General Manager got J.R.'s birth date from defense counsel. Hr. Tr. Vol. 1, 115:21–25. This conflicts with the information the General Manager provided in a sworn declaration. The General Manager stated "During [J.R.'s] onboarding, [he] provided a Permanent Resident Card listing his date of birth as October 24, 2003." Molina-Tepa Decl. ¶ 6.

The Secretary did not call the General Manager as a witness to examine his credibility or truthfulness. The Secretary did not call J.R. as a witness to inquire about whether he provided a Permanent Resident Card. There were no documents for the Court to examine other than the Form I-9 to determine whether the General Manager's assessment of J.R.'s age was reasonable. Without this information, the Court determines that the Secretary has not provided clear and convincing evidence that Defendants knew or should have known of the violation related to J.R.

Thus, the Secretary has met her burden as to two of the three alleged child labor violations. The Court concludes that there is one such violation at Plaza Yorktown and one at Plaza Hampton.

### ii.    Alleged Failure to Comply with Minimum Wage and Overtime Provisions

The Secretary argues that Defendants violated the Consent Judgment regarding payment of minimum wages and overtime. *See* Sec. Brief at 6–13. The Secretary raises four potential violations: (1) permitting tipped employees to work off-the-clock without compensation in

12

violation of minimum wage provisions; (2) permitting tipped employees to perform off-the-clock work without compensation for time worked over 40 hours; (3) failing to issue checks for net pay balances that remained after the tip credit was deducted, resulting in failure to pay minimum wage; and (4) failing to pay overtime to their first cooks. Sec. Brief at 6, 10. The Court will address each alleged violation in turn.

### a.  Alleged Violations Related to Tipped Employees

The Secretary's first two alleged violations relate to off-the-clock work that, if proven, result in violations of Sections 6 and 7 of the FLSA. The Court will analyze these issues together. There is clear and convincing evidence that tipped employees worked off-the-clock beyond their regular 40-hour schedule. This means that Defendants violated both the minimum wage and overtime provisions of the Act.

Defendants argue that the Secretary has not proven off-the-clock work. Def. Brief at 14. They argue that the Secretary failed to prove that Defendants knew or should have known of the violations. *Id.* Defendants contend that the WHD investigator had "no direct evidence" of unpaid work. *Id.*

Mere knowledge of a few incidents of off-the-clock work is insufficient to prove violations of the FLSA. *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 109 (4th Cir. 1988). However, proof may come in the form of "a pattern or practice of employer acquiescence in such work." *Id.* There is no better "proof of a pattern or practice of employer acquiescence" than the Consent Judgment itself. Defendants admitted that they violated Sections 6, 7, and 11 of the FLSA. Consent Judgment at 1. The Consent Judgment, and Defendants' conduct following the Consent Judgment, proves a pattern or practice of employer acquiescence in off-the-clock work.

13

An employee testified that he would arrive an hour before the restaurant would open to do work but would not clock in. Hr. Tr., Vol. 1, 53:16–22. Servers would clock in after they put the order in for their first table. *Id.* 54:17–21. Employees worked more than 40 hours a week. *Id.* 18:2–9. Employees would clock out when the last table paid their bill, but there was still work to do. *Id.* 55:22–25, 77:21–78:1. They were not paid for any of the time in which they were not clocked in. This changed in June 2024. *Id.* 60:6–9. But this has no bearing on whether Defendants violated the FLSA since the Court entered the Consent Judgment in September 2023. Thus, the Secretary has established violations of Sections 6 and 7 of the Act with clear and convincing evidence.

The Secretary has also proven that Defendants failed to pay employees on some occasions. There were certain instances in which employees were to receive positive net pay, yet their paychecks came out to nothing. Hr. Tr., Vol. 1, 109:15–16; Hr. Tr., Vol. 1, 61:7–15. The August 2024 payroll shows employees receiving net pay. *See* Ex. 3. The TowneBank statements show bounced checks for corresponding check amounts. *See* Ex. 4. Thus, employees were not paid in those instances. The Secretary has met her burden that Defendants violated Sections 6 and 7 of the Act.

### b. Alleged Violations Related to First Cooks

The Court first addresses whether First Cooks are exempt under the FLSA. As discussed below, the Consent Judgment includes First Cooks. But both parties raised First Cooks' exempt status and spent a significant amount of time on it at the hearing, so the Court will address the issue. The Fair Labor Standards Act provides that an employee must not work longer than forty-hour workweeks "unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he

is employed." 29 U.S.C. § 207(a)(1). But this section does not apply to "any employee in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).

Defendants argue that the Secretary failed to rebut evidence that First Cooks qualify as exempt executive employees under the FLSA. Def. Brief at 11. Defendants argue that the First Cook who testified "is salaried, serves as the 'person in charge' of kitchen operations, oversees multiple cooks and a dishwasher, and has authority to identify staffing needs and terminate employees." *Id.* at 11.

An employer bears the burden of proving that an employee's job falls within one of the exemptions outlined in 29 U.S.C. § 213(a)(1). *Darveau v. Detecon, Inc.*, 515 F.3d 334 (4th Cir. 2008) (citing *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 7 (1st Cir. 1997)). And "the remedial nature of the statute requires that FLSA exemptions be narrowly construed against the employer[] seeking to assert them." *Id.* (internal quotation marks omitted). An employer who seeks to show that an employee is exempt from the minimum-wage and overtime-pay provisions must do so by a preponderance of the evidence. *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 54 (2025).

Congress did not define these exemptions. Congress instead delegated authority to the Labor Department to issue regulations "to define and delimit" the exemptions. *Calderon v. GEICO General Ins. Co.*, 809 F.3d 111, 121 (4th Cir. 2015). An "employee employed in a bona fide executive capacity" means an employee:

(1) Compensated on a salary basis at not less than the level set forth in § 541.600;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a)(1)–(4). The parties do not dispute the first and third elements. *See* Sec. Brief at 11–13; *See* Def. Brief at 11. Therefore, the Court concludes that these elements are satisfied. But the parties disagree on the remaining two elements. The Court will address them in turn.

The Court concludes that Plaza's First Cooks' primary duty is not "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a)(2). The phrase "primary duty" is defined in Section 541.700. An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The amount of time an employee spends doing exempt work is a "useful guide." 29 C.F.R. § 541.700(b). A court must consider all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Relevant considerations include (1) the relative importance of the exempt duties as compared to other types of performed duties; (2) time spent performing exempt work; (3) the employee's relative freedom from direct supervision; (4) and the relationship between the employee's salary and the wages paid to other employees for the kind of non-exempt work performed by the employee. 29 C.F.R. § 541.700(a)(1)–(4).

Factors one and two involve the distinction between exempt and non-exempt work. Managerial, and therefore exempt, work is defined as follows:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; ... disciplining employees; planning the work; determining the

techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used ... ; [and] planning and controlling the budget....

29 C.F.R. 541.102.

*Relative importance of the exempt duties*. First, courts determine how important exempt duties are by measuring "the significance of the managerial tasks to the success of the facility." *Smith v. Brennan*, 115 F. Supp. 3d 691, 699 (E.D. Va. 2015). The managerial tasks Defendants claim First Cooks perform (supervising others and sharing opinions on other employees' performance) are important. But they are not relatively more important "compared to other types of performed duties," namely cooking. 29 C.F.R. § 541.700(a)(1). There is very little evidence that Plaza Yorktown "could not have operated successfully unless [First Cooks] performed [their] managerial functions." *Jones v. Virginia Oil Co.*, 69 Fed. App'x 633, 638 (4th Cir. 2003). Some crucial managerial functions include "ordering inventory, hiring, training, and scheduling employees, and completing the daily paperwork." *Id.* The Court notes that First Cooks "need to teach [new hires] their duties" and that this may be considered training employees. Hr. Tr., Vol. 1, 47:10–11. But this is where the vital managerial functions end. First Cooks do not order inventory. *See id.* 23:3–4. They do not hire or schedule employees. *Id.* 35:16–17; *see generally* Hr. Tr., Vol. 1. And there is no evidence that they complete daily paperwork. *See generally* Hr. Tr., Vol. 1. This factor weighs in favor of non-exemption.

*Time spent performing exempt work*. Second, First Cooks spend most of their time doing non-exempt work. A First Cook testified that when he arrives in the morning he does "the most essential things for cooking." Hr. Tr., Vol. 1, 19:10–12. He spends "three to four hours" preparing food before Plaza Yorktown opens. *Id.* 19:19–21. If the kitchen runs out of food, he cooks more. *Id.* 19:22–24. The First Cook also completes other duties that are not cooking. Indeed, he makes

sure that other cooks are doing their work. *Id.* 21:19–20. But there are other tasks he does that are indistinguishable from other cooks: "on Saturday there's cleaning the kitchen." *Id.* 18:6. He also fills in "if there's somebody missing on the grill" or "on the line." *Id.* 20:5–7. And First Cooks cover other employee's breaks, on a rotating basis, "pretty much cooking in the kitchen the entire day." *Id.* 20:12–13.

*Relative freedom from direct supervision.* Third, it is not clear that First Cooks enjoy "relative freedom from direct supervision." From the evidence presented to the Court, First Cooks do not engage in significant management duties without the General Manager's "interference or supervision." *Smith v. Brennan*, 115 F. Supp. at 700. First Cooks make the supply list and gives it to the General Manager to order it. Hr. Tr., Vol. 1, 23:1–6. If a cook is needed, First Cooks ask the General Manager to hire someone. *Id.* 46:18–19. The General Manager even checks their cleaning. *Id.* 60:25–61:2. The general manager has a role in supervising First Cooks in their duties—this factor weighs in favor of non-exemption. *Cf. Smith v. Brennan*, 115 F. Supp. 3d at 701.

*Relationship between employee's salary and the wages paid to other employees for the kind of non-exempt work performed by the employee.* There is no testimony about a disparity in wages between First Cooks and Other Plaza employees. "This factor is accordingly neutral." *Id.* at 701.

The burden of demonstrating something by a preponderance of the evidence requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence. *Salem v. Holder*, 647 F.3d 111, 116 (4th Cir. 2011) (internal citation omitted). A "holistic" analysis that "'step[s] back' to look at the position in question with a broad[] lens" reveals that First Cooks' primary duty is not management. *Emmons v. City of Chesapeake*, 982 F.3d 245, 256 (4th Cir. 2020) (quoting *Morrison v. Count of Fairfax*, 826 F.3d 758, 772 (4th Cir. 2016)). To be sure, First

Cooks perform some exempt tasks. But to say that these tasks are "the principal, main, major or most important duty that the employee performs" would be overstating the evidence before the Court. 29 C.F.R. § 541.700(a). This factor weighs in favor of non-exemption.

Even if Defendants did meet the "primary duty" prong, they did not establish that First Cooks have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). Defendants mischaracterize the First Cook's testimony about the weight of his recommendations in hirings and firings. The First Cook never indicated that he has the authority to terminate someone, as Defendants suggest. Def. Brief at 11 (citing Hr. Tr. Vol. 1, 47:1–4). Instead, the First Cook said, "[m]aybe I could [fire someone], but I never have." Hr. Tr. Vol. 1, 47:4. This is hardly testifying that he has authority to fire someone.

Additionally, on direct examination, the First Cook was asked about a Declaration he provided in which he stated that his recommendations to the general manager greatly influence hiring decisions. *Id.* 47:5–7. When asked whether he has had the opportunity to make recommendations for hiring and firing, the First Cook states "[the manager] tells me a new person has arrived, you need to teach them their duties." *Id.* 47:8–11. Additionally, the First Cook testified that there is information in that portion of the Declaration that is "false or inaccurate." *Id.* 37:17– 23. The Court has concerns about the Declaration the First Cook provided, especially given his testimony that portions of the Declaration are not accurate. Defendants have therefore failed to meet their burden of showing that First Cooks are exempt as bona fide executives.

The Court's classification of First Cooks as non-exempt is bolstered by the Consent Judgment itself. The Court ordered Defendants "to pay their employees back wages and liquidated

damages in the total amount of $11,400,000.00" as outlined in Exhibit A1. Consent Judgment at 4. Included in the list of employees that the Consent Judgment covered is the First Cook who testified. *Id.*, Ex. A1 at 13. The Secretary and Defendants agreed to the terms of the Consent Judgment and Exhibits A1 and B1 were "incorporated in and made a part of" the Consent Judgment. *Id.* at 2, 4. Defendants agreed that they owed First Cooks back wages and liquidated damages for their FLSA violations. It follows that First Cooks are not exempt. Therefore, the argument that First Cooks are exempt from the FLSA after signing a Consent Judgment indicating otherwise does not prevail.

Having determined that First Cooks are not exempt, the Court turns to the alleged overtime violations related to First Cooks. The Secretary has presented clear and convincing evidence that Defendants' employment of First Cooks over 40 hours without compensation violates the Act and the Consent Judgment. Indeed, Defendants' only attempt at refuting this alleged violation was arguing that First Cooks are exempt. *See* Def. Brief at 10–11. They do not refute that the First Cook at Plaza Yorktown worked over 40 hours and was not compensated for those hours. *See id.*

The First Cook at Plaza Yorktown testified that there are times he works more than 40 hours a week. Hr. Tr., Vol. 1, 18:2–3. On weekends he left later than he is scheduled and testified that every week he works more than 40 hours. *Id.* 18:4–9. His paycheck never changes, even during weeks in which he works more than 40 hours. *Id.* 18:22–19:1. Neither the hearing transcript nor Defendants' post-hearing brief refutes this. *See generally* Hr. Tr. Vol. 1, 24–45; *see also* Def. Brief 2–3, 10–11. Thus, the Secretary has met her burden of proving Defendants violated the Consent Judgment and Section 7 of the FLSA by failing to pay overtime to their First Cooks.

### i.   Alleged Recordkeeping Violations

Defendants also failed to adequately "make, keep, and preserve records of employment" related to the "wages, hours, and other conditions and practices of employment" as required by the Consent Judgment. Consent Judgment ¶ 1(b). The Secretary cites several examples, including the alleged failure to "(1) maintain time records for employees who performed pre- and post-shift work, (2) maintain record of minors' ages, (3) maintain record of overtime hours by first cooks, and (4) failing to keep corresponding checks or other evidence confirming that net pay balances were paid to employees." Sec. Brief at 14.

For example, the Court has considered Defendants' alleged failure to maintain records of minors' ages. Defendants did not have a date of birth on file for minor B.C. Hr. Tr., Vol. 1, 162:4–7. There is clear and convincing evidence that Defendants violated the Consent Judgment by failing to keep record of minor employees' ages. Further, as discussed above, employees were not compensated for their off-the-clock work, and there is likewise no record of it. Hr. Tr., Vol. 2, 260:25–261:5. Employees would send their reports in after clocking out and continue to work. Hr. Tr., Vol. 1, 77:21–78:1. And there was no way for them to record this time. *Id.* 78:16–79:1. Defendants have failed to make, keep, and preserve records of employment as required by Section 11 of the Act and the Consent Judgment.

### ii.   Alleged Failure to Cooperate with the Wage and Hour Department's Investigation

Next, the Secretary argues that Defendants failed to cooperate with WHD investigators. Sec. Brief at 15. They argue that WHD was forced to expend additional resources to surveil and obtain a warrant. *Id.* While getting the warrant, a minor that WHD observed was fired, and they could not interview him on site. *Id.* at 15–16. Defendants argue that the WHD investigator

"admitted Plaza fully cooperated, provided full access, and supplied all requested documents." Def. Brief at 17 (citing Hr. Tr. 189:4–190:15).[5]

Under Section 11(a) of the FLSA, the Secretary has the power to "question [] employees" and "investigate and gather data regarding the wages, hours, and other conditions and practices of employment in any industry subject to this chapter." 29 U.S.C. § 211(a). Defendants did not cooperate with the Secretary's investigation, even if temporarily. WHD obtained a warrant, something they were not required to do, which cost time and resources. As discussed further below, WHD has the power to conduct unannounced visits. Denying investigators access to the establishment impedes their ability to "investigate and gather data" about the normal "conditions and practices" at Plaza. *Id.* Instead of cooperating in the investigation, Defendants were delaying it. Accordingly, Defendants are in violation of the Consent Judgment.

### iii.    Harm to the Secretary

Defendants' conduct harmed the Secretary. The Secretary has an interest in protecting employees from their employer's misconduct. Defendants' conduct after the Consent Judgment "seriously threatens [the Secretary's] ability to monitor employers and protect workers." *Su v. Med. Staffing of Am., LLC*, No. 2:18-CV-226, 2023 WL 8261389, *5 (E.D. Va. Nov. 29, 2023). Therefore, the Secretary has established that she suffered harm.

### B. Remedies

Having determined that the Secretary has met the elements of contempt, the Court turns to fashioning a remedy. The Secretary requests that the Court sanction Defendants by:

(1) requiring Plaza Hampton, Plaza Yorktown, and Mr. Leon to hire a third-party auditor, with expertise in payroll audits and the FLSA (WHD shall retain the right to object to the auditor and the auditor must be approved by the Court), to audit all Defendant Plaza restaurants named in this litigation;

---

[5] This is a generous interpretation of the investigator's testimony. *See* Hr. Tr. 189:4–190:15.

(2) requiring Plaza Hampton, Plaza Yorktown, Mr. Leon to pay the back wages calculated by WHD since the Consent Judgment (and any additional back wages owed from the date of the entry of any contempt Order), and for other responsible Defendant Plaza restaurant[s] to pay the back wages uncovered by the auditor since the Consent Judgment (and any additional back wages owed from the date of the entry of any contempt Order), with WHD retaining the right to inspect a sampling of the records and the auditor's back wage computations;

(3) requiring Mr. Leon to also hire an independent monitor (WHD and the Court retaining the right to object) to ensure that minors are not working at any Defendant Plaza restaurants in violation of the Act;

(4) requiring Mr. Leon, Plaza Yorktown, and Plaza Hampton to provide any records WHD requests to determine whether those records reflect additional violations, which WHD shall report to the auditor for evaluation and remedy;

(5) imposing daily coercive fines, attorneys fees, and investigative fees;

(6) issuing an order affirming the Acting Secretary's right to inspect Defendant Plaza restaurants and interview employees without prior notice.

Mot. at 1–2. The Secretary argues that Defendants' violations persisted despite hiring an auditor. Sec. Brief at 17. She argues that the violations "underscore the necessity of the remedies she requests. *Id.* And the Secretary argues that these sanctions should apply to all Plaza Restaurants. *Id.*

Defendants argue the Secretary's proposed sanctions are "baseless and excessive." Def. Brief at 17. Defendants argue that the sanctions are too broad and are based on assumptions rather than actual violations. *Id.* at 18. They further argue that imposing attorneys' fees is improper. *Id.* at 19.

District courts enjoy wide latitude to impose a sanction that is compensatory, incentivizing, or both. *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 466 (4th Cir. 2020) (internal citation omitted). Sanctions must be remedial and compensatory, rather than punitive. *Gen. Motors Corp.*, 61 F.3d at 259. When the Court imposes a sanction, "it is not only vindicating its legal authority to enter the initial court order, but it also is seeking to give effect to the law's purpose of modifying

the contemnor's behavior to conform to the terms required in the order." *Klopp*, 957 F.3d at 466 (quoting *Bagwell*, 512 U.S. at 828).

The Court is required to use the "least power possible" to achieve the proposed end. *Shillitani v. United States*, 384 U.S. 364, 371 (1966). The Court concludes that some of the Secretary's suggested sanctions are reasonable and that others are excessive given the evidence before the Court. The Court will address each of the proposed sanctions in turn.

The Secretary first proposes that Plaza Yorktown, Plaza Hampton, and Mr. Leon be required to hire a new third-party auditor. The Court concludes that this proposed sanction is unnecessary. Defendants, in an effort to prove that they complied with the Consent Judgment, revealed that Plaza updated their clock-in and clock-out system. Before June 2024, employees performed work after clocking out. Hr. Tr., Vol. 1, 60:6–9. Starting in June of 2024, employees clock in when they arrive and clock out when they leave. *Id.* 59:13–19. Changing Defendants' clock-in and clock-out process should alleviate many of the concerns the Secretary raised here. To be sure, Defendants' auditor should be making regular appearances at Plaza locations to look for potential violations and has not been doing so. Hr. Tr., Vol. 2, 277:18–22. But "[f]rom June on," employees have been working on the clock. Hr. Tr., Vol. 1, 60:8–9.

Second, the Secretary proposes that the third-party auditor compute all back wages Defendants owe and require them to repay them. As stated above, the Court will not require Defendants to hire a new third-party auditor focused on payroll audits and the FLSA. The Court will simply require the current auditor to compute the back wages Defendants owe. Thus, Defendants must pay the back wages calculated by WHD since the Consent Judgment, any additional back wages owed from the date of the entry of this Order, and other responsible Defendant Plaza restaurants must pay the back wages uncovered by the auditor since the Consent

24

Judgment, and any additional back wages owed from the date of the entry of this Order, with WHD retaining the right to inspect a sampling of the records and the auditor's back wage computations.

Third, the Secretary asks the Court to require Mr. Leon to hire an independent monitor to ensure minors are not working at any Defendant Plaza restaurants in violation of the Act. Defendants' auditor missed the unlawful employment of minors B.C. and D.A. Therefore, hiring an independent monitor to ensure Defendants do not employ minors in a manner prohibited by the Act is justified. But the Court will only impose this sanction on Plaza Hampton and Plaza Yorktown. This matter only concerns the conduct of two Plaza locations. True, the auditor uses the same process across all locations, but the Secretary has not uncovered or presented child labor violations at any other Plaza location. The Court will not speculate about other violations. To extend this sanction to other locations would use more than the "least power possible" to achieve the Court's goal of correcting Defendants' behavior. *Shillitani*, 384 U.S. at 374.

Fourth, the Secretary requests that Mr. Leon, Plaza Yorktown, and Plaza Hampton provide any records WHD requests to determine whether those records reflect additional violations, which WHD shall report to the auditor for evaluation and remedy. Defendants argue that because they "have fully cooperated, produced extensive records, and proactively ensured compliance" that this request is excessive. Def. Brief at 19. But it is not. It is simply a request that ensures Defendants' continued cooperation and "give[s] effect to the law's purpose of modifying" Defendants' behavior. *Klopp*, 957 F.3d at 466.

Fifth, the Secretary requests daily coercive fines, attorneys' fees, and investigative fees. Defendants insist that the Secretary's request for attorneys' fees and investigative costs lacks legal basis because "[c]ivil contempt fees require willful misconduct." Def. Brief at 19. They argue that fees are awarded only in exceptional circumstances. *Id.* This is not so. In fact, the Fourth Circuit

has "never required district courts to find a party's willful disobedience before awarding attorneys' fees." *De Simone*, 36 F.4th at 536. Thus, the Court will award attorneys' fees for expenses related to Defendants' disobedient conduct. *Id.* It is not punitive to impose these fees either: "an award of 'attorney's fees incurred because of the misconduct at issue' is compensatory." *Id.* (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017)). Awarding the Secretary attorneys' fees and investigative fees compensates the Secretary, which is a proper purpose of sanctions. *United Mine Workers*, 330 U.S. at 303–04. Further, the Court concludes that daily coercive fines for each restaurant that the auditor or child labor monitor reports have violated the Act and Consent Judgment is reasonable and indeed necessary to bring Defendants' employment practices into compliance.

The Secretary's sixth and final proposed sanction is reasonable. Nothing in the Act, or the Consent Judgment, requires the Secretary to provide notice before a visit. *See* 29 U.S.C. § 211; *see also* Consent Judgment. And this makes sense: unannounced visits allow the investigators to do their jobs.[6] Simply stated, if Defendants have nothing to hide, there should be no reason to fear an unannounced visit. Accordingly, the Secretary may conduct unannounced visits to Defendant Plaza restaurants.

## C. Scope of the Court's Order

Lastly, these sanctions should also apply to Mr. Leon. An "employer" may be held liable for not complying with the Act. *Brock v. Hamad*, 867 F.2d 804, 808 n.6 (4th Cir. 1989). "Employer includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d) (internal quotation marks omitted). Mr. Leon has an ownership

---

[6] Indeed, "[t]he investigator has sufficient latitude to initiate unannounced investigations in many cases in order to directly observe normal business operations and develop factual information quickly." *Fact Sheet #44: Visits to Employers*, WAGE AND HOUR DIV., U.S. DEP'T LAB., https://www.dol.gov/agencies/whd/fact-sheets/44-flsa-visits-to-employers (last visited April 26, 2025).

interest in all Plaza Locations. Resp. to RFA at 4. Mr. Leon fits squarely into the definition of employer. Therefore, the Act, Consent Judgment, and the sanctions should apply to him.

## IV.    CONCLUSION

For the reasons set forth above, the Court **FINDS** that the Secretary has established by clear and convincing evidence that Defendants are in civil contempt. Accordingly, the Secretary's Motion to Adjudge Plaza Azteca Yorktown, Plaza Azteca Hampton, and Ruben Leon in contempt of the Court's September 26, 2023, Consent Judgment and Order is **GRANTED**. ECF No. 83. A separate order, which is attached to this Opinion, details the relief granted.

The Court **DIRECTS** the Clerk to provide a copy of this Memorandum Opinion and Order to the parties.

**IT IS SO ORDERED**.

Norfolk, Virginia
May 20 , 2025

Raymond A. Jackson
United States District Judge

27